IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DESPOIR, INC. (d/b/a Wedgewood Golf), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 8817 |
| | ) | |
| | ) | Judge Mark Filip |
| NIKE USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This is an inter-corporate patent law dispute about the design and manufacture of golf

clubs. Despoir, Inc., doing business as Wedgewood ("Wedgewood" or "Plaintiff"), commenced

a patent infringement action against Nike USA, Inc. ("Nike" or "Defendant"). Wedgewood filed

a two-count second amended complaint on February 20, 2004 (D.E. 7), that alleges Defendant

infringed on two of its patents, United States Patent Number 6,248,026 ("'026") and United

States Patent Number 6,139,446, ("'446 ") by making, using, selling, and offering to sell a golf

club, the Nike CPR Wood, in violation of 35 U.S.C. § 283. Defendant has moved for summary

judgment on grounds of non-infringement. (D.E. 18.) Defendant also has moved to strike

portions of the declaration of one of Plaintiff's allegedly expert witnesses, Darin Aldrich. (D.E.

35.) For the reasons set forth below, Defendant's motion to strike is denied without prejudice to

its ability to renew further objections, if any, at an appropriate juncture such as trial. Defendant's

motion for summary judgment is denied without prejudice to its right (or Plaintiff's) to seek

summary judgment in light of the claim construction set forth herein.

## I.    THE PATENTS

In August 1998 and April 2000, Plaintiff (as assignee) filed patent applications with the United States Patent and Trademark Office ("USPTO" or "Patent Office"). (D.E. 20, Ex. A & Ex. C.) Wedgewood was subsequently granted the '446 patent in August 1998 (*id.*, Ex. A) and the '026 patent in April 2000, both entitled "Golf Club." (*Id.*, Ex. C). Both patents pertain to a golf club, a wood in particular, with a low center of gravity that supposedly "makes it generally easier to hit accurately than other golf clubs." (*Id.*, Ex. A, Col. 1:37-38.) The file history indicates that the '446 patent had eighteen claims, including two independent and similar claims, claims one and five. (*Id.*, Ex. A, Col. 6:50-7:2; Col. 7:15-34.) Patent '026 had twenty-four claims, including two independent and similar claims (with very similar wording as the independent claims in the '446 patent), claims one and twelve. (*Id.*, Ex. C, Col. 6:53-65; Col. 7:38-55.) For purposes of the pending motions, the patents will be treated as the same, since the relevant issues exist in both patents, and the differences between the two are immaterial, at least as the arguments have been framed at this stage.

Each patent embodies the invention, defined by patentee in its initial Abstract as:

A golf club [], comprising a striking surface, a toe region, a heel region, a sole plate, a mass region, and a hosel, the golf club further comprising a shaft attached to the club head by hosel of the club head. The sole plate extends from a bottom edge of the striking surface to a rear edge of the mass region and under the toe region to the heel region. The sole plate comprises the sole which contacts the ground as the club head lies at rest and has a width between about 1/2

---

[1] The relevant facts are taken from the Defendant's Local Rule 56.1 ("L.R. 56.1") statement of facts and exhibits and from Plaintiff's response to Defendant's statement of facts. Where the parties disagree over relevant facts, the Court sets forth the competing versions. The Court, as it must, will resolve genuine factual ambiguities in Plaintiff's favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

inch and about 1 1/2 inches. The mass region extends from the top side of the striking surface to the rear edge of the sole plate. The club head includes a vertical center of gravity below a median between the top edge of the striking surface and the bottom edge of the striking surface.

(*Id.*, Ex. A at 1, Ex. C at 96.) When Wedgewood originally filed its patent application for the '446 patent, it included a claim 5, which contained a limitation based on the "ratio of the sole plate to the sole." (*Id.*, Ex. B at 25.) Claim 5 was dependent on original claim 1. (*Id.*, Ex. B at 59.) Original claim 1 was rejected as having been previously anticipated, and as a result, original claim 5 was rejected. (*Id.*) Subsequently, Wedgewood amended its application to infuse the rejected claim 1 with the rejected claim 5, which later issued as a new claim 5 in the '446 patent. In its entirety, claim 5 looks like the abstract and claims that the product encompassed:

> a club head comprising a striking surface, a toe region, a heel region, a sole plate, a mass region, and a hosel;
> said striking surface comprising a face for striking a golf ball;
> said sole plate extending from a bottom edge of the striking surface to a rear edge of said mass region and under said toe region and said heel region, and comprising a sole resting on ground as the club head lies at rest, and having a width between about 1/2 inch and about 1 1/2 inches ["sole width limitation"], said sole plate extending from a toe edge to a heel edge and the ratio of the width of the sole plate to the width of the sole is between 6:1 and about 3:1 ["ratio of the sole plate to the sole limitation"];
> said club head including a vertical center of gravity below a median between the top edge of the striking surface and the bottom edge of the striking surface; and
> a shaft attached to said club head by the hosel of the club head.

(*Id.*, Ex. A, Col. 7:15-34). The final claim 1 looks much like the final claim 5, but without the 6:1 to 3:1 limitation and with a "lip limitation" which recognizes that the striking surface "compris[es] a face for striking a golf ball, *wherein said striking surface extends above a top side of said mass region to form a lip* extending between the striking surface and the top side of the mass region." (*Id.*, Ex. A, Col. 6:56-58) (emphasis added). Claims 1 and 12 of the '026 patent are essentially identical to claims 1 and 5 of the '446 patent, respectively, except there is no

3

mention of a "hosel."[2] (*Id.*, Ex. C, Col. 6:53-65; Col. 7:38-55.)

## II.    THE PARTIES AND THE CPR WOOD

Between December 22, 1999 and February 2, 2000, Wedgewood sent certain of its golf

clubs, apparently including those relevant to the instant litigation, to Tom Stites & Associates

("Stites") for testing. (D.E. 27 at 2.) After receiving these clubs, Stites inspected and tested the

clubs. (*Id.*) Soon thereafter, between July and December of 2000, Stites began consulting for

Nike. (*Id.*) Specifically, he began designing the club that is now known as the Nike CPR Wood.

In March, 2001, Stites became Nike Golf's Director of Product Creation. (*Id.*) In 2003, Nike

introduced the CPR Wood. (*Id.*)[3] Apparently, the supposed similarities between Wedgewood's

Wood and the CPR Wood are too close for Plaintiff's comfort. Plaintiff claims that the CPR

Wood infringes claims 1, 2, 3, 4, 5, 6, and 8 of the '446 patent and claims 1, 2, 4, 5, 6, 7, 8, 9, 12,

13, and 15 of the '026 patent. (D.E. 20 at 3.) Most important at this juncture are three

limitations inherent in Plaintiff's patent: the "sole width" limitation, the "ratio of the sole plate to

the sole" limitation and the "lip" limitation. Nike moved for summary judgment of non-

infringement, and it also seeks to strike the report of an expert of Plaintiff, Darin Aldrich.

### MOTION TO STRIKE

Before addressing Defendant's motion for summary judgment, the Court must address

Defendant's Motion to Strike. Nike argues that some of the tests conducted by Wedgewood's

---

[2] A "hosel" is defined as "a socket in the head of a golf club into which the shaft is
inserted." Merriam-Webster's Collegiate Dictionary (11th ed. 2003) at 601. The hosel
difference between the two patents is insignificant to the claims at issue.

[3] Although the CPR Wood comes in four versions, they are all materially the same. (D.E.
27 ¶ 5.) Thus, for purposes of this case, the Court will treat the four versions as identical.

proffered expert, Dr. Darin Aldrich, were inherently unreliable and failed to meet the standards for admissibility as articulated in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). (D.E. 35 at 3-4.) Nike urges that the Court should disregard any of Dr. Aldrich's testimony that concerns the results of his testing the size and width of the sole of the CPR Wood because his methods are unreliable and unproven and because the tests allegedly over-measured the actual width of the sole. (*Id.* at 4.)

Parties are not entitled to present allegedly expert testimony if it is subject to legitimate challenge under the law. Precedent teaches that a district court judge is to "act as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." *Dhillon v. Crown Controls, Corp.*, 269 F.3d 865, 869 (7th Cir. 2001) (citing *Daubert*, 509 U.S. at 589); *see also Dataquill Ltd. v. Handspring, Inc.*, No. 01 C 4635, 2003 WL 737785, at \*1 (N.D. Ill. Feb. 28, 2003). The gatekeeping function "focuses on an examination of the expert's methodology." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2001). Thus, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determinated by the trier of fact, or, where appropriate, on summary judgment." *Id.*

To fulfill their gatekeeping role, courts apply a two-step analysis to determine whether an expert's opinion may be admissible.[4] First, a district court judge must determine whether the

---

[4] A separate inquiry concerns whether a particular individual is qualified to be an expert. The Court will presume that Dr. Aldrich is an expert, as this argument is not raised in Defendant's motion to strike—the motion to strike concerns paragraphs seven through twelve of Aldrich's declaration, which set forth the methodology employed by Dr. Aldrich to determine the sole width of the CPR Wood. Any argument concerning Dr. Aldrich's expertise (or lack thereof) appears only in Defendant's reply brief in support of its motion for summary judgment (D.E. 30 at 2), not in the motion to strike. As a result, the Court does not consider this argument, at least

expert's testimony is reliable—whether it pertains to scientific knowledge, as the Court must "rule out subjective belief or unsupported speculation." *Riach v. Manhattan Design Studio*, No. 00 C 5883, 2001 WL 1143243, at * 3 (N.D. Ill. Sept. 25, 2001) (quoting *Daubert*, 509 U.S. at 590); *see also Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000). The question of admissibility asks whether "there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

To be considered scientific and thus admissible, the testimony must: (1) be based upon sufficient facts or data, (2) be the product of reliable principles and methods, and (3) come from a witness who has applied the principles and methods reliably to the facts of the case. *See* Fed. R. Evid. 702. Consideration 2 is the key factor for purposes of this motion to strike. Factors that may illuminate the analysis include: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subject to peer review and publication, (3) the known or potential rate of error of the technique, and (4) whether the theory or technique has been generally accepted by the relevant scientific community. *Daubert*, 509 U.S. at 590-91. These factors are merely guides, however, and do not serve as a series of prerequisites. The applicability of the *Daubert* factors depends on the particular facts and circumstances of each case. See *United States v. Cruz-Velasco*, 224 F.3d 654, 660 (7th Cir. 2000). While persuasive, the absence or presence of any *Daubert* factor is not necessary or dispositive regarding a method's reliability. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

Second, the court must determine whether the evidence assists the trier of fact in

at this juncture, as it is not properly presented. If Defendant believes it has a serious argument concerning Dr. Aldrich's expertise, Defendant may raise it at an appropriate juncture, such as in advance of any trial.

understanding the evidence or determines a fact in issue. Fed. R. Evid. 702. In other words, "[t]he twin requirements for expert testimony are relevance [the second prong] and reliability [the first prong]." *McReynolds v. Sodexho Marriott Svcs., Inc.*, 349 F. Supp. 2d 30, 2004 WL 2943234, at *1 (D.D.C. Dec. 20, 2004) (citing *Kumho Tire Co.*, 526 U.S. at 149-50).

The party offering the expert's testimony must establish by a preponderance of the evidence that the expert testimony is admissible and that the expert is qualified. *See Daubert*, 509 U.S. at 593; *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) ("[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable."). However, the question of whether Dr. Aldrich is "credible or whether [his] theories are correct given the circumstances of [the] case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." *Smith*, 215 F.3d at 719.

Defendant's motion to strike questions the methodology employed by Dr. Aldrich. Generally speaking, Defendant makes two sets of arguments. First, as to all of Dr. Aldrich's testing methods, Nike maintains that none had been used previously or is generally accepted, and that they lack any peer review. (D.E. 35 at 3.) Second, Defendant makes specific allegations of unreliability against individual methodologies. In the instant case, Dr. Aldrich used three different methods for quantifying the width of the sole on the CPR Wood. Two were "material transfer methods," where a material is "applied to one body and is transferred to another on contact," and the other was a "feeler gauge technique," which quantifies the gap between two surfaces. (D.E. 27, Ex. A at 3.)

7

## III.  GENERAL ALLEGATIONS OF UNRELIABILITY

The Court's first concern is what significance to attach to the fact that none of Dr. Aldrich's methods have been used to measure golf clubs before or reviewed by peers. In this regard, Plaintiff correctly notes that the techniques Dr. Aldrich used were in no sense controversial or radical; he applied conventional measurement techniques to solve an unconventional problem. (D.E. 38 at 4.) He did not choose the methods in lieu of some more accepted method—the Court has been apprised of no other tests that are better or more standard ways to measure in the golf club manufacturing industry. His underlying, basic approach is an accepted, recognized scientific method (*see Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999)) and has apparently been used in other circumstances to measure other objects and distances—such as in machine shops, and also with finger prints. (D.E. 27, Ex. A at 3-5.) Nor is there any inherent reason to suspect that the sole of a golf club is uniquely unable to be measured using his approach.

To be sure, the fact that a particular proposed method is not subject to peer review is a consideration that normally raises substantial concerns about the proposed expert testimony. Such concerns also may well provide fodder for effective cross-examination. In this case, however, because this was apparently first test of its kind, the fact that the methodology has not been reviewed by peers is not dispositive, at least as the record appears to exist. *See Kumho Tire*, 526 U.S. at 150-51 ("relevant reliability concerns may focus upon personal knowledge or experience . . . It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist."). Defendant also offers no suggestion that

8

the lack of a study or general acceptance is indicative of an industry-wide or consensus type of

rejection of Dr. Aldrich's practices. In fact, during the deposition of Clay Long, Defendant's

own golf expert, he stated—in response a question about the possibility of measuring the width

of the sole of a golf club— that it could be done and that he would conduct the measurement by

using ink and powder transfers.[5] (D.E. 27, Ex. B at 55:10-56:17.) Therefore, the Court holds

that the fact that Dr. Aldrich's tests do not meet all of the *Daubert* factors is not, in the atypical

circumstances of this case, fatal to Aldrich's ability to offer testimony. *See, e.g., Smith*, 215 F.3d

at 720-21 (holding that the district court had abused its discretion in finding a particular

methodology unreliable because there was no peer review, since all of the *Daubert* factors are

"relevant, though not dispositive, consideration[s]"); *Mitchell v. Gencorp*, 165 F.3d 778, 781

(10th Cir. 1999) (holding that the party offering expert testimony "need not prove that the expert

is undisputably correct or that the expert's theory is 'generally accepted' in the scientific

community"). Again, this case involves a novel measurement endeavor, and Defendant's own

expert offered testimony that one might construe as endorsing the techniques employed by

Wedgewood to address the problem at hand.

## IV.    SPECIFIC ALLEGATIONS OF UNRELIABILITY

        A.    Method 1: Powder Transfer

        The first transfer method was the "powder transfer method," in which double-sided

adhesive tape was placed across the bottom of the club, a thin layer of powder was spread onto a

2" by 2" piece of paper and placed on a rigid surface, and a CPR Wood was lowered onto the

---

        [5] Defendant alleges that in making this argument, the testimony of its expert was taken out of context. (D.E. 39 at 7-8.) The Court respectfully disagrees, at least to the extent that one might reasonably construe the disputed testimony as Plaintiff proposes.

powder bed at the "proper playing angle" of 63 degrees. (D.E. 27, Ex. A at 4.) The club was then removed from the powder bed and Aldrich measured the width of the powder track transferred to the sole of the club. (*Id.*) The test included ten, identical repetitions.

Defendant's motion to strike amounts to an incorporation of the arguments set forth in its reply memorandum in favor of its motion for summary judgment. In particular, Nike maintains that the powder test, as conducted by Dr. Aldrich, failed to measure or otherwise account for the thickness of the tape (which could affect how much powder is transferred to the tape), the depth and thickness of the powder bed, and the uniformity of the powder bed. (D.E. 30 at 8.) As a result, Defendant claims, Aldrich overmeasured the contact points, resulting in a measurement that was too wide. This is so because when the club was pressed down into the powder bed, the powder stuck to the tape on the bottom of the club "for not only the actual contact point, but also for any part of the club head that is closer to the table than the thickness of the powder bed." (*Id.*) Moreover, Defendant asserts that the above problems, combined with the use of a wooden table, which is "necessarily not smooth and has compressibility," created an error-prone system that was based on a series of layers, each with different characteristics. (*Id.*)

      B.      Method 2: Ink Transfer

According to Aldrich, the ink transfer test is "similar to the method for taking fingerprints from a person." (D.E. 30 at 5.) Aldrich placed the CPR Wood in contact with an ink pad and lowered the CPR Wood onto a 3" by 5" index card, again at the proper playing angle. (*Id.*) Aldrich removed the club from the card and measured the width of the ink track that, presumably, was transferred from the sole of the club to the card. Aldrich repeated this procedure ten times.

Defendant's complaints about the ink transfer test are similar to those of the powder test. In particular, Nike alleges that Aldrich's failure to take into account the thickness of the index card, whether the table was uneven or had a factor of compressibility, and the thickness of the ink deposited on the bottom of the club caused the measurement of the sole to be greater than its actual width. (*Id.* at 9.) Second, Nike invokes a portion of Newton's First Law of Motion—*i.e.*, that an object in motion tends to stay in motion—to argue that the club did not stop immediately upon contacting the index card. (*Id.*) Consequently, the requisite period of deceleration caused the club to have "some horizontal movement along the index card" before it stopped, causing the ink to leave a wider imprint than the actual contact point. (*Id.*) Defendant also complains about the "wicking" effect of ink, where ink continues to spread laterally even after contact ceases. (*Id.*) Finally, Defendant points to the "substantial variations" in the results of his ten repetitions to argue for the inaccuracy and unreliability of the test. (*Id.*)

C.      Method 3: Feeler Gauges

Finally, Aldrich clamped a CPR Wood down onto a rigid surface at a predetermined "proper lie angle"and inserted a thin piece of paper (with thickness .0035 inches, +/- .0005 inches), with the edge perpendicular to the leading edge of the club, from the head section towards the toe until it could not be pushed any farther. (*Id.* at 4-5.) Next he inserted a separate piece of paper from the heel section towards the toe until it could not be pushed any farther and marked the location of the "maximum penetration on both the heel side and the toe side." (*Id.*) He measured the distance between the two marks. (*Id.*) He conducted this test ten times.

Defendant raises three particular objections to the feeler gauge test. First, Nike maintains that, in fact, the test measured the width of the part of the club head that was within the thickness

11

of the paper to the table, not that part of the club head that actually contacted the table. (*Id.* at 5.) Thus, any portion of the club head that contacted the table *and* any portion of the club head that came within .0035 inches (the thickness of the paper) would be included in the result. Second, Defendant alleges that since different results could be had by using papers with different thicknesses, the test did not identify the actual contact width. (*Id.*) Finally, Nike asserts that the thickness of the paper used in the test "created substantial error"—that Dr. Aldrich's measured width of .57 inches should be reduced by .473 inches (the amount of the width he mistakenly included due to the gap between the table and that portion of the club lying within the thickness of the paper), to create an actual sole width of .097 inches. (*Id.* at 6-7.)

     D.     Analysis

     Defendant's objections to the aforementioned tests essentially center around the idea that due to inherent flaws in Aldrich's calculations (such as his not taking into account the thickness of the tape used), the results are inaccurate and hence unreliable, unhelpful, and inadmissible. Recent caselaw reminds district courts to act cautiously when deciding whether to exclude weak evidence; exclusion of evidence is not the presumptive course. *See, e.g., Tungate v. Bridgestone Corp.*, No. IP 02-0151-C H/K, 2004 WL 771191, at *4 (S.D. Ind. Mar. 26, 2004) (Hamilton, J.) (discussing and quoting *Daubert*). The emphasis seems to be on making sure that a jury has been appraised of an expert's alleged shortcomings so that it can give appropriate weight to the testimony. Although Nike has doubtless identified arguments that might undermine the persuasiveness of Aldrich's testimony, perhaps substantially, the alleged flaws that Nike identifies do not rise to the level of warranting exclusion of Aldrich's testimony in its entirety. *See Daubert*, 509 U.S. at 596 (teaching that "[v]igorous cross-examination, presentation of

contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. ").

In sum, Aldrich's methods and results were discernible, clear, and rooted in real science. Put differently, they were empirically testable and "intellectually rigorous." *Kumho Tire*, 526 U.S. at 152. As such, they are unlikely to give the jury a misguided impression, since they are subject to effective cross-examination by Nike, using perhaps many of the same arguments it used in its motion to strike. *See Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003) (holding it "is not a case where the jury was likely to be swayed by a facially authoritative but substantively unsound, unassailable expert evidence"). Nike can feel free to question vigorously Aldrich's results as it sees fit, and Wedgewood will almost certainly try to bolster Aldrich's testimony by demonstrating how the figures are properly calculated. This all is a matter of the weight of the testimony, not its admissibility. Therefore, Defendant's motion to strike portions of Dr. Aldrich's declaration is denied.

## **MOTION FOR SUMMARY JUDGMENT**

## V. **SUMMARY JUDGMENT FRAMEWORK**

A.     Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" as to whether patent claims encompass the accused device and "that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Novartis Corp. v. Ben Venue Labs. Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001); *Avia Group Int'l,*

*Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988); *see also Orbsak, LLC v. Gen. Instruments Corp.*, No. 99 C 6684, 2002 WL 172446, at \*2 (N.D. Ill. Feb. 4, 2002). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact, *see Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Mere "metaphysical doubt as to the material facts" does not amount to a genuine issue for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *See* Fed R. Civ. P. 56(c); *Foley*, 359 F.3d at 928. However, the Court is "not required to draw every conceivable inference from the record." *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) (quoting *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)). Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion. *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). The party opposing summary judgment may not rest upon the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 248. There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.*

      B.     Infringement Analysis

      Determining an allegation of patent infringement is a two-step process. *See Cybor Corp.*

14

*v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*). First, a court construes the meaning and scope of the patent claims at issue. *See id.* Second, a factfinder must decide whether the accused device infringes the construed claims. *See id.* The construction, as a matter of law, is the responsibility of the Court. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). Claims must be "particular and distinct. The primary purpose of this requirement of definiteness in claims is to provide clear warning to others as to what constitutes infringement of the patent." 3 Donald S. Chisum, *Chisum on Patents*, § 8.03 (2000). "It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (internal citation omitted).[6]

The language of the claims is always the starting point in claim construction, because it is the language that the patentee chose to "particularly point[] out and distinctly claim the subject matter which the applicant regards as his invention." *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112, ¶ 2). The specifications and the prosecution history, meanwhile, "provide a context to illuminate the meaning of claim terms." *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997); *see also Vitronics*, 90 F.3d at 1582 ("The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to

---

[6] Except where noted, the '446 patent and '026 patent have the same language and the parties do not draw distinctions between the two.

15

make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."). The specification is comprised of the summary, the background, the preferred embodiments of the invention, and the drawings to illustrate the embodiments. *Oakwood Labs., L.L.C. v. TAP Pharm. Prods.*, No. 01 C 7631, 2003 WL 21011785, at *1 (N.D. Ill. May 5, 2003). The prosecution history consists of the complete record of the proceedings before the Patent and Trademark Office, including prior art references and any express representations made by the applicant regarding the scope of the claims. *See Vitronics*, 90 F.3d at 1582-1583. Specifically, "[t]he prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

When intrinsic evidence unambiguously delineates the scope of the patent, reference to extrinsic evidence (such as expert testimony) is unnecessary to resolution of the issue of scope. *See Vitronics Corp.*, 90 F.3d at 1583 ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence.") (collecting cases).[7] Only where ambiguity exists despite

---

[7] Extrinsic evidence is "all other evidence beyond the patent, its specification, and its prosecution history." *See Douglas Press, Inc. v. World Wide Press, Inc.*, No. 99 C 7539, 2002 WL 663589, at *1 (N.D. Ill. Mar. 28, 2002). However, as discussed below, dictionaries are an exception to this rule. "Dictionaries, which are a form of extrinsic evidence, hold a special place and may sometimes be considered along with the intrinsic evidence." *Interactive Gift Exp., Inc.*, 256 F.3d 1323, at 1332 n.1 (Fed. Cir. 2001). Nonetheless, "the ordinary and customary meaning of a term [as illuminated by dictionary references] does not govern if the intrinsic record contains clear lexicography or disavowal of claim scope." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004).

examination of the intrinsic evidence may a court consider extrinsic evidence to assist in determining the meaning and/or scope of a claim's technical terms. *See Kopykake Enterx., Inc. v. Lucks Co.*, 264 F.3d 1377, 1381 (Fed. Cir. 2001).

In utilizing the claim language, "claim terms are given their ordinary meaning unless examination of the specification, prosecution history, and other claims indicate that the inventor intended otherwise." *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1277 (Fed. Cir. 1995); *see also Douglas Press, Inc.*, 2002 WL 663589, at *1. Dictionaries publicly available when the patent was issued are "objective resources that serve as reliable sources of information on the established meanings that would have been attributed to the terms of the claims" by individuals skilled in the relevant art or technology and may actually be "the most meaningful sources of information" in interpreting a claim, at least in the absence of further guidance from the intrinsic record. *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002); *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004); *Lyndex Corp. v. Heartech Precision, Inc.*, No. 03 C 3946, 2004 WL 42373, at *3 (N.D. Ill. Jan. 5, 2004).

Once this interpretive process is completed, the factfinder compares the construed claims to the device accused of infringing to determine, as a question of fact, whether all of the claim limitations in the first patent exist in the accused device. *See Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1369 (Fed. Cir. 2004); *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). "To prove infringement, the patentee must show that the accused device meets each claim limitation, either literally or under the doctrine of equivalents." *Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003)

(citation omitted); *accord Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1333 (Fed. Cir. 2001) ("The all-elements rule is that an accused device must contain every claimed element of the invention or the equivalent of every claimed element") (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997)).

## VI.   DISCUSSION

### A.   Claim Construction

At the heart of this case is the meaning of several words contained in the patents. Specifically, the parties debate the meaning of the term "sole" in construing the sole width and resulting ratio of the sole plate to the sole width in claim 5 of the '446 patent and claim 12 of the '026 patent. In relevant part, the claim limitation states that Wedgewood's golf club comprised "a sole resting on ground as the club head lies at rest, and having a width between 1/2 inch and about 1 1/2 inches." (D.E. 20, Ex. A, Col. 7:24-26; Ex. C, Col. 7:46-48.) Nike argues that its CPR Wood does not meet this limitation, because its "sole," properly understood, is much bigger than that of the patented wood. (D.E. 23 at 10.) Nike also asserts the CPR Wood does not have a "lip," within the meaning of claim 1 of the Wedgewood '446 patent and '026 patent. The language of the relevant claim states that the Wedgewood club head contains a "striking surface" that "extends above a top side of [a] mass region to form a lip . . . ." (D.E. 20, Ex. A, Col. 6:55-56; Ex. C, Col. 6:56-58.) As to this issue, the parties differ over the meanings of "mass region" and "lip." Therefore, the Court must construe the meaning of the "sole," "mass region," and "lip."

1.   "Sole"

18

The definition of "sole," as used in the '446 and '026 patents is material for two reasons. First, Nike alleges that it could not have infringed Plaintiff's patents because the CPR Wood does not meet the "sole width" limitation in each patent. Secondly, and relatedly, Nike maintains that the CPR Wood does not meet the "ratio of the sole plate to the sole" limitation in the patents. To address these issues, the Court must construe the meaning of "sole."

The *American Heritage Dictionary of the English Language* gives the following relevant definitions for the word "sole:"

1. The part on which something else rests while in a vertical position, especially:
   a. The bottom surface of a plow.
   b. The bottom surface of the head of a golf club.

American Heritage Dictionary of the English Language 1654 (4th ed. 2000). Possibly helpful is one of the definitions of the verb "soling," which is "To put the sole of (a golf club) on the ground, as in preparing to make a stroke." (*Id.*) Therefore, contact between the ground and a bottom surface of a club head appears to be a fundamental aspect of a "sole." Nike's suggests that the proper construction of "sole" is that the "golf club must have *distinguishable portion* on the bottom of the club head that is *designed to* contact the ground as the club lies at rest and that has a width between .48 and 1.52." (D.E. 23 at 6 (emphases added).) Nike argues that the "designed to" language is present in the patent itself, under the description of Wedgewood's preferred embodiment of the invention. (*Id.* at 6 (citing D.E. 20, Ex. A, Col. 4:29-31 ("The sole is the portion of the sole plate which is designed to contact the ground as the club lies at rest.")).) Nike further claims the "designed to" language is necessary to provide predictability and

certainty to the definition, since without that language, what constitutes the sole would change depending on how the club was held and upon which surface it rested. (*Id.* at 9.) Nike's added "distinguishable" language is designed to provide additional certainty by separating the sole from the sole plate. (*Id.* at 6.)

Wedgewood's proposed construction is that "sole" should be interpreted to mean "the portion of the sole plate which contacts the ground as the club head lies at rest." (D.E. 26 at 3.) Wedgewood rejects the significance of any difference between what a claim is designed to do and what it actually does and what type of "ground" the club is resting on (since "ground," in Wedgewood's view, means a "flat, planar surface"). (*Id.* at 4.) Moreover, Wedgewood argues that the "designed to" language in its specification, as highlighted by Nike, should be read as simply another way to write "contacts the ground," since other portions of the specification state that the sole "contacts the ground," without inclusion of the "designed to" language. (*Id.* at 6.) Wedgewood also responds that because "distinguishable" is not in any claim, its inclusion would amount to a wrongfully-added limitation. (*Id.*)

          a.     Intrinsic Evidence

             i.     Words of the Claims

The relevant claims in the '446 and '026 patents do not expressly define the term "sole," other than to state, in relevant part, that it "rest[s] on ground as the club head lies at rest." (D.E. 20, Ex. A, Col. 7:24-25.) Neither the claims' actual language nor the ordinary definition of the word "sole" makes any mention of the sole being distinguishable or designed to contact the ground (as opposed to merely actually touching the ground). It remains to be seen if the

20

patentee's use of the term is consistent with the general meaning, or if Plaintiff limited the meaning in the specification or prosecution history.

ii.     Specification

The specification is often the "single best guide to the meaning of a disputed term." *Vitronics, Corp.*, 90 F.3d at 1582. It acts as a sort-of dictionary, explaining the definition and often defining terms used in the claim. *See Markman*, 517 U.S. at 373. However, limitations may not appear in the specification only, since "interpreting what is meant by a word in a claim is not to be confused with adding an extraneous limitation appearing in the specification, which is improper." *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989); *see also Oakwood Labs., L.L.C.*, 2003 WL 21011785, at * 5. Rather, a specification "using words or expressions of manifest exclusion or restriction" must represent a "clear disavowal of the claim scope" to be effective. *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). To avoid a situation where the specification "trumps" the claim language in construing the claim, the Federal Circuit has cautioned the courts:

> Consulting the written description and prosecution history as a threshold step in the claim construction process, before any effort is made to discern the ordinary and customary meanings attributed to the words themselves, invites a violation of our precedent counseling against importing limitations into the claims. *For example, if an invention is disclosed in the written description in only one exemplary form or in only one embodiment, the risk of starting with the intrinsic record is that the single form or embodiment so disclosed will be read to require that the claim terms be limited to that single form or embodiment.* Indeed, one can easily be misled to believe that this is precisely what our precedent requires when it informs that disputed claim terms should be construed in light of the intrinsic record. But if the meaning of the words themselves would not have been understood to persons of skill in the art to be limited only to the examples or embodiments described in the specification, reading the words in such a confined way would mandate the wrong result and would violate our proscription of not reading limitations from the specification into the claims.

21

*Texas Digital Sys., Inc.*, 308 F.3d at 1204-05 (emphasis added).

At one point the specification states that the "sole is the portion of the sole plate which is designed to contact the ground as the club lies at rest." (D.E. 20, Ex. A, Col. 4:29-32.) At another, however, the "designed to" language is not present. (e.g. *Id.*, Ex. A, Col. 1:29-31.) In fact, there is no other place in the entire patent where Wedgewood uses "designed to" in terms of its discussion of the club head and contact with the ground. Thus, the *Texas Digital Systems* warning might be apt. However, the concern underlying the *Texas Digital Systems* decision is not in place in the instant case. It is apparent that the absence of the "designed to" language in much of the patent is not the result of a conscious decision to avoid the language. Instead, the "designed to" language is implicit in the parts of the intrinsic record that leave it out due to its obviousness. It goes without saying that the club must be designed to, or intended to, contact the ground as the club lies at rest—if, as is the case, the club ordinarily "contacts" the ground as the club lies at rest when it is properly held and handled for striking a golf ball. The patent itself says as much by virtue of the fact that the patent includes claims about the sole contacting the ground. Patents, by definition, are based on what that invention is designed to do, not for any conceivable use (or misuse) of that particular invention. Wedgewood itself recognizes as much, when it maintains that there is no difference between what a club is designed to do, and what it actually does. (D.E. 26 at 4.)

Thus, the Court rejects Wedgewood's contention that it is inappropriate to include the concept "designed to" when interpreting the Wedgewood patents at issue. As Nike explains, if one fails to incorporate some notion of "designed to" into the definition of the patent, there would be grave potential for indeterminacy in the patent, both as to what constitutes the "sole,"

22

but also as to what constitutes the ratio of the "sole plate" to the "sole," which is another critical aspect of the patent.

If the "designed to" concept were not included, analysis of what it means to "contact" the ground and what part(s) of the club head contact the ground would vary wildly and could be manipulated so as to affect the patent infringement analysis. For example, if the "sole" was just the portion of the club that actually touched the ground—irrespective of club design and whether the golf club is properly held and aligned to strike a golf ball—one could manipulate the "sole," for example, by simply pushing downward excessively on the club shaft so as to create an enlarged "sole." One could also manipulate the size of the "sole" by holding the club at improper angles to the ground, so that the "sole" would shrink as the club was artificially brought towards or pushed away from the golfer's body. The same result would be achieved by allowing a golfer who was too short for the club, or too tall to properly use the club, to attempt to square off to hit a shot.

One cannot have a construction that could be manipulated through the simple expedient of pressing harder on a club (and thus creating a greater "sole" and smaller "soleplate-to-sole" ratio). Nor can one have a claim construction that will vary depending on the particular angle at which any given golfer (or competing inventor) uses (or purposefully misuses) a club. To have an accurate measurement of the sole, that measurement must be consistent and identifiable. Since the sole must be "designed to" contact the ground while at rest, lest the measurements be inconsistent and the soleplate-to-sole ratio limitation be meaningless (since the sole width would be indeterminate), the "designed to" language cannot be a limitation, but rather is a mere clarification. Therefore, it is proper to hold that the sole is that part of the club that is designed to

23

contact the ground.

The Court also agrees with Nike that the sole must be a "distinguishable portion" of the sole plate. It is clear from the specification that the bottom of the club head is comprised of a sole plate and a sole. (*Id.* at 8.) To be able to calculate a ratio between the width of the sole plate and the width of the sole, the two must be able to be separately calculated.

The specification indicates that the sole is contained within the sole plate and is only a portion of the sole plate. (D.E. 20, Ex. A, Col. 4:29.) The specification goes on to point out that while the sole rests on the ground, that part of the sole plate attached to the heel and toe of the club remains off the ground, such that it is the sole portion of the sole plate that generally creates a divot (by contacting the ground) during a golf swing. (*Id.*, Ex. A, Col. 4:40-45.) In fact, the drawings attached to the patent indicate that the sole (numbered 32) is identifiable and separate from the sole plate (numbered 30). (*Id.*, Ex. A at 4 (Fig. 5).) Even the abstract notes that "[t]he sole plate comprises the sole which contacts the ground as the club head lies at rest. . . ." (*Id.*, Ex. A at 1.) By this statement, Plaintiff's patent seems to indicate that while the rest of the sole plate does not touch the ground, the sole is markedly different in that it does contact the ground.

Plaintiff maintains that requiring the sole to be a "distinguishable portion" of the sole plate would amount to importing a limitation into the claims. However, given the discussion of ratios in a variety of claims and the various distinctions in the intrinsic record between the sole and the rest of the sole plate, the Court does not see how the "distinguishable" language is a limitation. In the absence of an ability to distinguish what is the "sole" from the rest of the "sole plate," one could not coherently discuss the ratio of the soleplate to the sole as the patent

24

specifically contemplates and incorporates. In this respect, the "distinguishable" language dovetails nicely with the "designed to" language.

Nonetheless, as explained further below, the Court finds that Nike's proposed method of ascertaining that "distinguishable portion" of the sole plate—which approach appears to require a separately delineated or demarcated subsurface either on the sole plate or extending from it in order to qualify as the "sole"[8]—is not the approach that is most consistent with the terms of the patent as they would be understood to those in the industry. Although neither party fully explores the "distinguishable portion" concept in its briefs, both Nike and Wedgewood appear to understand Nike's position as one requiring that the sole be an "extension from the bottom of the club" (D.E. 26 at 6), or at least to be some separately engineered and demarcated subsurface on the bottom of the sole. As Wedgewood explains, there is nothing in the text of the patent's language that requires or suggests such a limitation. In addition, Figures 5 through 9, included within the '446 and '026 patents, do not appear to suggest, much less require, a separately demarcated section on the sole plate face. (D.E. 20, Ex. A, at 4-6.) Moreover, although the problems of indeterminacy that Nike identifies would be intractable if there were no way to determine what distinguishable portion of the "sole plate" is actually the "sole," there is a manner of addressing that concern suggested by the arguments of the parties that does not require introducing the idea that the "sole" is a separate demarcated subcomponent of the sole plate or is

_____

[8] See generally D.E. 23 at 10 (Nike asserting that "[t]he 'sole' on the NIKE CPR Wood golf club . . . is the ornamental portion of the NIKE CPR WOOD golf club with the NIKE logo and border around it."); id. at 11 (Nike photo); D.E. 26 at 6 (discussing Nike interrogatory answer describing the "distinguishable portion" as an "extension from the bottom of the club . . . .").

25

an extension thereto.

Instead, as one of Nike's own exhibits states, the sole is "the bottom of a wood or iron head that would *normally* touch the ground." (D.E. 20, DX L, at 225 (emphasis added).) This notion of "normalcy" suggested by Nike's exhibit is more consistent with a recognition that a golf club will, if used properly, be held at a particular angle and rest in a particular manner against the ground. Such an approach also appears to comport with the understanding of both parties' experts. Plaintiff's expert spoke of "the appropriate lie angle" for testing the club and its resting point on the ground (D.E. 27 (Pl. Resp. to Def.'s SF), Ex. A (Aldrich Decl.) ¶ 13), which angle Dr. Aldrich calculated to be 63 degrees for the Nike CPR wood. (*Id.* ¶¶ 13-16) Dr. Aldrich, Plaintiff's expert, also explained that he determined the "proper playing of angle of 63 degrees" with a "Mitchell Angle Machine" (*id.* ¶ 14), which Wedgewood acknowledges to be "a standard piece of equipment in the club-making industry." (D.E. 38 at 6; *see also* D.E. 31 (Def. Resp. to Pl.'s SF) ¶ 25 (parties agree that the "correct lie angle for the 26 degree CPR Wood is 62 degrees, +/- 1 degree"); ¶ 26 (parties agree that the lie angle of a golf club "is a standard industry measurement"); ¶ 18 (Defendant not disputing Plaintiff's factual assertion that the "lie angle refers to the natural position of a golf club where the club is not rocked forward on its toe or rearward on its heel").) Dr. Long, Nike's expert, similarly acknowledged the determinacy of the notion of the "standard lie angle" of a golf club. *See* D.E. 27, Pl. Ex. B (Long. Dep.) at 59 (Q: "So a standard lie angle — or a lie angle is a standard measurement in the club making industry, correct?" A: "That's correct."); *id.* at 60 (Q: "[T]he lie angle refers to a natural position where the club is not up on its toe or on its heel, correct?" A: "That's correct."). Given that the intrinsic record does not support the idea that a "sole" must be a separately delineated or

26

demarcated subsurface either on the sole plate or extending from it to qualify as a "sole," and given that the parties and their experts agree that a "standard lie angle" can be ascertained in the golf club industry within a specificity of plus or minus a single degree, employing the concept of "standard lie angle" seems much more reasonable and consistent with the intrinsic record and the expert testimony than importing in an entirely new limitation.

The only remaining aspect to the determinacy problem is, as Nike points out, whether the standard lie angle approach is rendered meaningless because of the fact that sometimes on a golf course there are different types of terrain. (*See* D.E. 23 at 9.) To be sure, this is a non-frivolous issue. However, the Court finds persuasive the solution suggested by Wedgewood—namely, that one should interpret the term "ground" in the patent's language to mean a "flat, planar surface." (*See, e.g.*, D.E. 26 at 4.) Such an approach is also consistent with Nike's Exhibit L (the book, "Golf Club Design, Fitting, Alteration and Repair" by Ralph Maltby (4th Ed. 1995), at 225), which discusses the sole in terms of the portion of the bottom of a club that "would normally touch the ground." (*Id.*) Given the choice between: (1) importing a concept into the patent's meaning that appears nowhere in the text of the intrinsic record or in the accompanying drawings (namely, as Nike suggests, the notion that there must be a separately delineated or demarcated subsurface either on the sole plate or extending from it in order to qualify as the "sole"), or (2) requiring that measurements about the "sole" be made in relation to the "ground" being a "flat, planar surface" (an orthodox understanding of the term that comports with the idea of a "normal" situation in striking a golf ball), the Court considers the second course to be the one most consistent with the intrinsic record in this case and the testimony of the parties' experts. Wedgewood, through its proffered evidence in the form of the Aldrich analyses, would not

27

appear to be in any position to object to such a definition for "ground" in the patent. (*See* D.E. 27, Pl. Ex. A (Aldrich Decl.) at 3, ¶ 11 ("In order to make accurate measurements on the sole portion of the club at rest, the term ground is taken to be a rigid, flat surface. Any other interpretation of 'ground' would lead to erroneous measurements that could not be widely practiced by those skilled in the art.").) The approach also is consistent with the manner in which Nike's expert conducted at least some of his own testing (*see, e.g.*, D.E. 27, Pl. Ex. B (Long Dep.) at 51 (Q. "Well, if you were talking about measurements, would you assume ground means a hard surface?" A. "I think, generally, if I were measuring a club in the laboratory, I would be using a hard, flat plate."); *id.* at 51 (Q. "So is it fair to say when you use 'ground' in that figure, you're using it synonymously with a flat plate?" A. "Yes."))—although to be entirely fair to Nike, it and its expert have always raised the issue about how there is tall grass and sand on a golf course and not only flat surfaces.[9] Furthermore, when Wedgewood chose to

---

[9] Nike also suggests, through its expert, for example, (*see* D.E. 27, Pl. Ex. B (Long Dep.), at 51), that one must consider the fact that a club often is designed with the intent that the club create a divot when it is used, and that this precludes use of a definition of the ground as a flat, planar surface. But even if a club is intended to often create a divot, indeterminacy is not lessened by viewing the meaning of "ground" in the patent as anything other than a flat, planar surface. For example, regardless of how a club is engineered, if a golf ball is lying on an incline adjacent to a fairway, the golfer likely will be standing on that flat surface and will strike the ball such that an unorthodox fraction of the normal sole actually will be creating any divot. Similarly, if a golf ball is resting in a steep sand trap, the golfer may purposefully swing behind the ball and swing much if not all of the club head under the sand. In that instance, far more of the club will pass through the sand. Unless one analyzes the "sole" in terms of an understanding of "ground" in the patent as a flat, planar surface, the fact that a club may be designed to often create a divot or contact the sand does not add determinacy to the analysis of the "sole" or the "sole plate to sole" ratio. The only way to avoid those sorts of indeterminacy issues—which otherwise can be solved by viewing "ground" as a flat planar surface and requiring the "sole" measurements to proceed with the club resting at a "standard lie angle"—is to import the notion into the patent that the "sole" must be a detectible area otherwise demarcated on the face of the sole plate or extending from the sole plate. But, as explained above, nothing in the language of the patent or the relevant drawings included with the patent application supports the latter approach.

28

discuss terrain that was not flat, such as in the Summary of the Invention, it did not use the term "ground" but instead specifically described the terrain's consistency and characteristics. (*See, e.g.*, D.E. 20, Ex. 1, Col. 1:38-42 ("The golf club of the present invention is also especially useful in certain situations, including, for example, hitting a golf ball out of a difficult lie (such as from the rough or from a fairway bunker) . . . ."; Col. 4:45-47 (discussing "longer grass"), 4:54-57 (same); *accord id.*, Ex. C, Col. 1:43-47; *id.*, Col. 4:48-50; *id.*, Col. 4:56-59.)

In sum, the Court believes that the manner of solving the indeterminacy problem identified by Nike (which cannot be ignored, given that the patent expressly requires that one be able to calculate a "sole plate" to "sole" ratio), while remaining consistent with the intrinsic record, is to view "ground" as a flat, planar surface. That limitation, combined with the requirement that the "sole" must be measured in conformity with the "standard lie angle" recognized in the golf industry, will allow for an ascertainable "sole." The "sole," under this analysis, will be a portion of the sole plate that is "distinguishable" (and thus able to be used to calculate the "sole plate to sole" ratio) and "intended to" contact the ground. In fact, the "distinguishable" and "intended to" requirements compliment each other, in that the "sole" can be measured and distinguished as being that portion of the sole plate that is intended to and does contact the "ground" when the club is held at its proper angle, as recognized by golf professionals.

### iii. Prosecution History

The Court turns to the prosecution history of the patents to inquire whether any statements made during the prosecution about the meaning of "sole" affect the term's scope. The

29

Court notes at the outset that neither party has brought to the Court's attention any portions of the prosecution history that shed additional light on the meaning and scope of the term "sole." And after independent investigation, the Court can detect none. There is no indication in the prosecution history, for example, that Plaintiff intended to limit the definition of "sole" to any separately delineated or demarcated subsurface either on the sole plate or extending from it. And there is no suggestion that "ground" means anything other than a flat, planar surface. Nor is there any suggestion that the sole was indistinguishable from the sole plate; in fact, the intent of the prosecution history runs parallel with the that of the specification—that the sole plate and the sole were intended to be distinguishable.

Therefore, the Court construes the word sole to mean "the distinguishable portion of the sole plate designed to contact the ground (*i.e.*, a flat, planar surface) and contacting the ground as the club lies at rest, with the club contacting the ground at the standard lie angle for the club at issue."[10]

### 2. Lip Limitation

In its motion for summary judgment of non-infringement, Nike also maintains that the CPR Wood does not meet Wedgewood's "lip" limitation in claim 1 of the '446 patent (D.E. 20, Ex. A, Col. 6:55-58) and claim 1 of the '026 patent (*id.*, Ex. C, Col. 6:56-58). (*See* D.E. 23 at

---

[10] Nike generally contended that the term "about" in the patent should be construed to mean +/- .02 of an inch. This definition would produce a specific measurement for the sole as between .48 of an inch and 1.52 inch. Although the Court would be inclined to adopt this definition (Wedgewood does not meaningfully object to Nike's proposal), in light of the fact that the briefing largely proceeded within the context of Nike's proposed claim construction, and the fact that the Court has not wholesale adopted the positions of either Nike or Wedgewood, the Court will not pass definitively on the "about" issue pending further briefing as appropriate in light of further developments in this case.

17.) The relevant claim language (the same in both claims) states that the patented club contains a "striking surface comprising a face for striking a golf ball, wherein said striking surface extends above a top side of [a] mass region to form a lip." (D.E. 20, Ex. A, Col. 6:55-56; Ex. C, Col. 6: 56-58.) To understand this limitation as a whole, the Court must construe the phrase "mass region" and "lip."

a. Mass region

Among the various dictionary definitions of "mass," there are two which merit mention in the present inquiry. A mass is "[a] unified body of matter with no specific shape: *a mass of clay*," or "a grouping of individual parts or elements that compose a unified body of unspecified size or quantity." American Heritage Dictionary of the English Language (4th ed. 2000) at 1076. As for "region," it is defined as "[a] large, usually continuous segment of a surface or space; area." *Id.* at 1470. However, in the context of the Wedgewood patent, the meaning of the term "mass region" is not answered by dictionary guidance—in that it is more context-specific or idiosyncratic—and both parties acknowledge this in that they do not focus on dictionary guidance but rather put forth extended arguments grounded in the intrinsic record.[11]

---

[11] Included among Wedgewood's summary judgment materials are the declaration of its proffered expert, Dr. Aldrich. (D.E. 27, Ex. A.) In his declaration, Aldrich expressly acknowledges that "[t]he term mass region is not commonly used to describe structures within a golf club." (*Id.*, Ex. A ¶ 19.) Given this express recognition, the Court does not understand Wedgewood's passing footnote reference to the dictionary definitions of "mass" and "bulk" (*see* D.E. 26 at 7 n.6) to be the heart of its argument concerning the proper construction of the term "mass region." Moreover, as Nike points out, the related interrogatory-based proposed definition of Wedgewood (*i.e.*, that the mass region is the "bulk area of a club head, located behind the striking surface") is materially defective and unworkable in that it is too vague and provides too little notice to the public regarding the scope of the patent claims. *See* D.E. 23 at 18. In any event, Wedgewood makes no serious attempt to advance or defend this vague definition, and the Court accordingly analyzes the term "mass region" in light of Wedgewood's more substantive

31

Nike argues that "mass region" should be construed to mean 'the portion of the golf club head that is behind the striking surface." (D.E. 23 at 18.) Plaintiff maintains that this construction is erroneous, since it relies on language in the specification that "identifies where the mass region is located—not what it is." (D.E. 26 at 8.) Furthermore, Plaintiff asserts, Nike's definition would vitiate the "lip" limitation, since, according to Wedgewood, the lip is adjacent to the striking surface, positioned between the striking surface and the top of the mass region. (*Id.*) Wedgewood proposes the following construction for the mass region: "the body of a wood-type club head extending above the median and below the top edge of said striking surface, delimited by a sole plate, a sole, a striking surface, a heel region, a toe region, a rear edge, a single and substantially continuous top side and a lip." (*Id.* at 7.) Nike objects, maintaining, among other things, that the phrases "single and substantially continuous topside" and "median" are "pull[ed] . . . out of thin air." (D.E. 30 at 15.)

The disagreements between the parties as to the construction of mass region, therefore, include the following issues: whether (1) the mass region is simply "behind" the striking surface (without regard for the lip), (2) the topside of the mass region is necessarily "single and substantially continuous," and (3) the mass region is comprised of a region that is located above a "median" on the striking surface of the club.

i.      Words of the Claims

Although the claims frequently refer to the "mass region," they do little to define it. Many parts of the club are described *around* the mass region—*e.g.,* the club head's center of

---

arguments, which are based on the intrinsic record and which comprise the overwhelming majority of its presentation on this issue.

gravity is described as being "between the bottom edge of the striking surface and the rear edge of the top side of the mass region" (D.E. 20, Ex. A, Col. 8:23-27); the sole plate extends "from a bottom edge of the striking surface to a rear edge of said mass region" (*id.*, Ex. A, Col. 6:59-60))—but the mass region itself remains undefined, at least in any single unified place.[12] Given the lack of any clearcut or comprehensive definition in the claims, the Court examines the specification and the prosecution history for further guidance.

## ii. Specification

The specification contains many references to the mass region, and both parties rely heavily on them. At one point, as Nike notes, Plaintiff's specification states that "[t]he mass region is provided behind the club head striking surface." (D.E. 20, Ex. A, Col. 4:66-67.) However, the specification goes on to explain that the mass region "is connected to the striking surface at a lip extending between the two adjacent to the top edge of the striking surface. The top side of the mass region slopes downward linearly from the lip to the rear edge of the mass region." (*Id.*, Ex. A, Col. 4:67-5:4.) Moreover, as explained above (see note 12, *supra*), the claims state that the "striking surface [of the club] *extends above a top side of said mass region*

---

[12] As explained further below, the claims do provide meaningful guidance, at least on some issues. For example, the claims state that the "striking surface [of the club] extends *above a top side of said mass region to form a lip* extending between the striking surface and the top side of the mass region." D.E. 20, Ex. A, Col. 6:55-58 (emphasis added); *accord id.*, Ex. C, Col. 6:57-58. This language makes clear that the top of the mass region under this patent cannot, at a minimum, extend beyond the top of the striking surface, at least in any contact area. The claims also state that "the height of said lip . . . is the vertical distance between the top edge of said striking surface and the top side of said mass region, [and] is between about 1/8 inch and about 1/2 inch." *Id.*, Ex. A, Col. 7:3-6; *accord id.*, Ex. C, Col. 7:11-13. This claims language indicates that if there is to be a lip, it must reach or span from an extended striking surface down to the mass region at any contact area.

*to form a lip* extending between the striking surface and the top side of the mass region" (D.E.

20, Ex. A, Col. 6:55-58) (emphasis added), and further state that "the height of said lip . . . is the

vertical distance between the top edge of said striking surface and the top side of said mass

region, [and] is between about 1/8 inch and about 1/2 inch." (*Id.*, Ex. A, Col. 7:3-6; *accord id.*,

Ex. C, Col. 6:57-58, Col. 7:11-13). This language also indicates that any lip must reach from an

extended striking surface down to the mass region, and that the lip is not part of the mass region

itself. All of this evidence indicates that Nike's assertion that the mass region is "behind" the

striking surface, while true, is not sufficiently precise; more specificity is required, lest the

placement of the lip be completely discounted and the lip limitation disregarded.

The specification also states that the mass region's lowest point is demarcated by its "sole

plate" and "sole" (*Id.*, Ex. A, Col. 2:61-62)), at its rear by its "rear edge" (*Id.*, Ex. A, Col. 5:52-

54) and on its top by a "top side"(*Id.*, Ex. A, Col. 5:21-24). The pertinent drawings also indicate

that the mass region is, generally, the body of a wood-type club head. (*Id.* at 2, 3).

There is nothing explicit in the specification, however, that mentions a "single and

substantially continuous" topside or a "median" on the club face. Rather, these terms come from

(as Plaintiff cites) the drawings of the club in the patent. The Court is reluctant to add the

descriptive phrase "single and substantially continuous" to describe the topside simply based on

the drawings. In its specification, Plaintiff saw fit to add the phrase "substantially flat" to

describe the face on the striking surface of the golf club. (*Id.*, Col. 3:35-36.) Wedgewood made

sure to specifically define "substantially flat" as "lacks a bulge and roll sufficient to cause a gear

effect." (*Id.*, Col. 3:6-8.) In the paragraphs immediately preceding the discussion of the club's

flat face, Plaintiff discussed the top side of the mass region with no explanatory phrases. Having

34

recognized in the specification the significance of a portion of the club that is "substantially flat," it stands to reason that Wedgewood would have thought to include the phrase "substantially continuous" to describe the top side of the mass region if it indeed was necessary to do so. *See Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 598 (S.D.N.Y. 2004) (recognizing the validity of the canon of construction, *expressio unius est exclusio alterius*, in a discussion about the meaning of the term in patented items); *accord, e.g., Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 513 (2002) (applying the *expressio unius* canon). The first meaningful representation or assertion that the top side of the mass region was "single and substantially continuous" appeared over six years after Plaintiff filed the patent, in its memorandum in opposition to Defendant's motion for summary judgment. The inclusion of this phrase appears to denote a conscious attempt to improperly reshape the scope of the patent. The Court respectfully refuses to adopt the "singular and substantially continuous" language. *See also Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d at 1053 (limitations inferable from embodiments shown in patent drawings or specifications, but omitted from claims, are not to be read into claims).

Similarly, although the specification refers to the club head's vertical center of gravity as below the "median distance" between the top edge and bottom edge of the striking surface, it does not mention that a "median" point or region exists in or on the club. Conceivably, to a layman, the "median" could be interpreted to mean the club's midpoint, but that cannot be the case here. The "midpoint" is referred to specifically in both the specifications and the drawings. The "median," however, is not. As neither party has indicated where this point is or what its significance is, and since the patent does not provide any information to suggest that a "median" limitation exists within the four corners of the patent, the Court will not read one in.

### iii.    Prosecution History

As with the "sole" limitation, neither party points to any portion of the prosecution history to indicate that it would be helpful in construing the patentee's use of the disputed term. The Court's own analysis finds that the prosecution history does not provide anything more than what is in the final patent. Consequently, the prosecution history is of no help in construing the meaning of the "mass region."

Based on its analysis, the Court will construe the term "mass region" in the Wedgewood patent as "the body of a wood-type club head delimited by a sole plate, including the sole; a striking surface, though no higher than its top edge; a top side; a rear edge; a heel region; and a toe region." The Court further construes the term to recognize that a lip will reach or span from an extended striking surface down to a mass region. *See* D.E. 20, Ex. A, Col. 7:3-6 ("the height of said lip . . . is the vertical distance between the top edge of said striking surface and the top side of said mass region, [and] is between about 1/8 inch and about 1/2 inch."); *accord id.*, Ex. C, Col. 7:11-13 (same); *see also id.*, Ex. A, Col. 6:55-56 (the "striking surface [of the club] extends above a top side of said mass region to form a lip . . . .) Ex. C, Col. 6:57-58 (same).

### b.    Lip

Wedgewood suggests that dictionary definitions are of principal importance in defining the patent term "lip."  In support of its position, Wedgewood notes the following definitions for "lip": "'1. either of the two fleshy folds . . . forming the edges of the mouth . . . . 2. anything like a lip, as in structure . . . .'" (D.E. 26 at 10 (quoting *Merriam-Webster's New World Dictionary* at 824 (2d college ed. 1984).)  From this starting point, Wedgewood asserts that "[t]he plain and

ordinary meaning of lip is: either (i.e. meaning one or the other) of two fleshy folds that surround or form the edges of the human mouth." (D.E. 26 at 10.) Wedgewood then asserts (in response to Nike's commonsense objection that defining "lip" as "anything like a lip" would appear to suffer from substantial circularity problems) that its argument is not unfirm, because the "'as in structure' language only serves to state the obvious: the structure identified in the patents is not made of flesh and it does not form the edge of a mouth." (*Id.*) Wedgewood thereafter immediately proceeds—in what, in all respect, appears to be somewhat of a non-sequitur—to assert that, while its "lip" is not made of flesh and does not relate to a mouth, "it is a fold." (*Id.*)

This assertion is meaningful because Wedgewood then pivots to a definition of "fold," which states that "[a] fold is: 'a part doubled or laid over another part: pleat.'" (*Id.* (quoting *Merriam-Webster's New Collegiate Dictionary* at 479 (9th ed. 1989).) From this, Wedgewood asserts that a "lip" is simply a two-sided structure (D.E. 26 at 10), although Wedgewood also contends (with no recognition of the convoluted path its has wended simply to arrive at the "fold" definition, nor recognition that the "fold" definition does not appear even in Wedgewood's own view to answer the interpretative question presented) to make clear that a "lip" is certainly not "limited to a structure containing only two sides." (*Id.* at 10, n. 10.)

Nike also references certain dictionary definitions, but it principally bases its interpretive argument on evidence in the specification and other intrinsic evidence. In this regard, Nike highlights that both parties acknowledge that the term lip is not commonly used in the golf club industry and does not have a common meaning within that industry's lexicon. (D.E. 23 at 20 (citing D.E. 20, Ex. E (Stites Decl.) ¶ 24 & Ex. O (Long Decl.) ¶ 20); D.E. 30 at 13 (citing D.E. 27, Pl. Ex. A (Aldrich Decl.) ¶ 20 (Plaintiff's expert acknowledging that "[t]he term lip is not

commonly used to describe structures within a golf club and does not have a common meaning within the lexicon.")).) Nike suggests that the proper course is to look to the portions of the specification it highlights to ascertain how Wedgewood has defined the term "lip."

The Court begins by respectfully rejecting much of Wedgewood's proposed approach to the interpretive question, as it appears to suffer from multiple flaws. First, where, as here, it is clear that there is no settled understanding of the meaning of the term at issue in the relevant economic market or art, the Federal Circuit has cast grave doubt on the propriety of using generic dictionary definitions, at least where the intrinsic record appears to offer valuable guidance about the meaning of the disputed term. Specifically, in *Venderlande Industries Nederland BV v. International Trade Commission*, 366 F.3d 1311 (Fed. Cir. 2004), the Federal Circuit recently instructed:

> where evidence . . . demonstrates that artisans would attach a special meaning to a claim term, or, as here, would attach no meaning at all to that claim term (independent of the specification), general-usage dictionaries are rendered irrelevant with respect to that term; a general-usage dictionary cannot overcome credible art-specific evidence of the meaning or lack of meaning of a claim term.

*Id.* Given that there is no question that the term "lip" has no ordinary meaning within the golf club industry (*see, e.g.*, D.E. 27, Pl. Ex. A (Aldrich Decl.) ¶ 20 (recognition of Plaintiff's expert)), it would appear to be improper under applicable precedent to turn to generic dictionary definitions when, as explained further below, the intrinsic record provides more context-specific guidance.[13]

---

[13] Plaintiff's cited authority (D.E. 26 at 11) does not undermine the force of the Federal Circuit's recent teaching in *Venderlande*. In one of its cited cases, *Optical Disk Corp. v. Del Mar Avionics*, 208 F.3d 1324 (Fed. Cir. 2000), there was no argument even made (much less

Second, even if it were appropriate to look to general-purpose dictionary definitions, Wedgewood's argument on such a basis is flawed. To begin, Wedgewood's dictionary-based, plain meaning argument is rooted in awkward and unpersuasive jumps between the definition of "lip" (which at the end of the day, does very little in the analysis), the definition of "fold," and the notion that a fold has two sides. Even this does not provide any definitive guidance, even on Wedgewood's own terms, as it believes a "lip" can have more than two sides as well. The idea that a "lip" is simply a multi-sided structure would appear to include numerous disparate structures (*e.g.*, octahedrons and pyramids) that could not reasonably be considered a "lip" and that cannot be reconciled with the intrinsic record.

In addition, the predicate for Wedgewood's argument is its use of a 1984 *Merriam-Webster's New World Dictionary* (2d college ed.) for its definition of "lip," as being "anything like a lip, as in structure . . . ." As Nike points out, by the time the patents in dispute were issued, this aspect of the definition appears to have been removed from Plaintiff's own cited dictionary series. *See* D.E. 31, Ex. CC (*Merriam-Webster's Collegiate Dictionary* at 679 (10th ed. 1996)). Given that Plaintiff's proposed dictionary-based interpretation is predicated, at least in part, on a

established, as is the case here) that those skilled in the relevant art would not ascribe any meaning to the term at issue. *Optical Disk* also acknowledged the significance of examining the intrinsic record to see if interpretive guidance were available there. *Id.*, 208 F.3d at 1334-35 ("'A technical term used in a patent is interpreted as having the meaning that it would be given by person experienced in the field of invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning.'") (quoting *Hoescht Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996)). Plaintiff's second case, *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002), also did not involve any argument or showing that those versed in the relevant art or industry would not ascribe any meaning to the term at issue, necessitating a look at the intrinsic record. It also recognized that it may be appropriate and necessary to draw from the intrinsic record where the patentee has acted as his own lexicographer in relation to a particular term. *Id.*, 288 F.3d at 1366-67.

definition for the disputed term that was removed from Plaintiff's own cited dictionary series during the time period when the patents were applied for and issued (*i.e.*, 1998-2001), Plaintiff's proposed interpretive approach rests on an infirm foundation that is likewise inconsistent with precedent. *See Kopykake Enter., Inc., v. The Lucks Co.*, 264 F.3d 1377, 1383 (Fed. Cir 2001) (objective interpretation calls for look at what those skilled in the relevant art would have understood disputed term to mean "as of the date the invention was constructively reduced to practice—*the date the patent application was filed.*") (emphasis added) (collecting cases); *accord Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1345 (Fed. Cir. 2003).[14]

As explained above, the Court finds Wedgewood's interpretive approach to the analysis of "lip" to be flawed. That stated, the Court notes that the parties' proposed definitions for "lip" are not wholly dissimilar. Nike suggests that "lip" should be construed to mean "an extension to the striking surface that is adjacent and approximately parallel to the striking surface and that extends above the top side of the mass region." (D.E. 23 at 18.) Wedgewood's proposed definition is that the lip is "a structure having a top side extending back from the striking surface

---

[14] Plaintiff contends that *any* dictionary publicly available at the time the patent was issued can be relied upon—regardless, apparently, of how long ago the dictionary was published. Plaintiff cannot be taking the extreme position it appears to embrace—taken literally, the position would enable a present-day inventor to harken back to decades-old dictionaries that were publicly "available," even if contemporary language did not embrace the same meaning for disputed words. This Court need not attempt to resolve all theoretical permutations concerning dictionary use to conclude that: (1) the federal circuit has clearly stated that a "fundamental principle for discerning the usage of claim language is the ordinary and accustomed meaning of the words amongst artisans of ordinary skill in the relevant art *at the time of invention*," *ResQNet.com, Inc. v. Lansa, Inc.* 346 F.3d 1374, 1378 (Fed. Cir. 2003) (emphasis added); and (2) an interpretive strategy that relies on a fifteen year-old definition of a critical word, which definition was discarded by the dictionary series of the definition's own proponent at the time the patent was issued, is not an approach that can readily be taken to resolve an interpretive debate.

and another side extending down toward the top side of a mass region," although it made clear that this definition would be capable of expanding to embrace multi-sided structures. (D.E. 26 at 10; *id.* at 10, n. 10.)

This competing definitions present two principal sub-issues—namely, whether the lip is an extension "to" the striking surface or whether it extends "from" the striking surface, and whether the lip is "approximately parallel" to the striking surface.

### i. Words of the Claims

As Nike points out, the words of the claims are instructive in resolving the first sub-issue in its favor. The claims state that the "striking surface extends above a top side of [the] mass region to form a lip." (D.E. 20, Ex. A, Col. 6:55-56; *accord* Ex. C, Col. 6:57-58.) Claim 2 of the '446 patent and claim 5 of the '026 patent explain that the height of the lip is "the vertical distance between the top edge of said striking surface and the top side of said mass region, [and] is between about 1/8 inch and about 1/2 inch." (*Id.*, Ex. A, Col. 7:3-6; *accord* Ex. C, Col. 7:10-13.) This language strongly suggests that the "lip" (or at least one side of it) is an extension "to" the striking surface. Such an understanding is confirmed by other parts of the intrinsic record, as discussed further below.

### ii. Specifications

The specification makes several references to the "lip" in the claimed invention. The first states that a "lip is formed by providing that the striking surface extends above the top side of the mass region." (D.E. 20, Ex. A, Col. 3:2-4; *accord id.*, Ex. C, Col. 3:6-7.) The bulk of the references to the "lip" in the specification come in one paragraph:

41

The lip between the top edge of the striking surface and the mass region is formed by extending the striking surface above the top side of the mass region. The height of the lip, being the vertical distance between the top edge of the striking surface and the top side of the mass region, is preferably about 1/8 inch to about 1/2 inch. The lip increases the surface area of the face, thereby increasing the sweet spot of the face . . . .

The lip also provides more weight to the striking surface near the heel region and the toe region than without the presence of lip, which increases the force behind those shots hit from those areas and thus increasing the margin for error for shots hit from those areas.

(*Id.*, Ex. A, Col. 3:48-65; *accord id.*, Ex. C, Col. 3:51-4:2. The further specification notes that

the "mass region is connected to the striking surface at a lip extending between the two adjacent

to the top edge of the striking surface." (*Id.*, Ex. A, Col. 4:67-5:2; *accord id.*, Ex. C, Col. 5:2-4.)

These passages from the specification can be broken into two portions. Some of the references

concern descriptive elements of the lip, including its location on the club and its size. Others

discuss the purpose of the lip, namely, to increase the surface area of the face and to give more

weight to the striking surface.

This language serves to confirm that the "lip" is an extension "to" the striking surface.

The specification's guidance that "[t]he lip . . . is formed by extending the striking surface above

the top side of the mass region," (D.E. 20, Ex. A, Col. 3:48-50), dovetails with claim language

that states that "said striking surface extends above a top side of said mass region to form a lip."

(*Id.*, Col. 6:55-56; *accord id.*, Ex. C, Col. 3:52-54; Col. 6:57-58). Plaintiff seems to protest

Nike's definition by arguing that the specification "does not define the lip—it simply describes

the spatial relationship between the striking surface, top side of the mass region, and the lip."

(D.E. 26 at 12.) But much of the language Nike refers to in the specification is also present in the

claims themselves. Furthermore, it is unclear to the Court why Wedgewood contends that

Defendant's proposed construction is an issue of spatial relationship, not definition. "Spatial

42

relationship" and "definition" need not be mutually exclusive. One commonsense way to describe something is to state its location and relation to the surrounding areas; thus "Chicago" becomes "a large city on the Southeast tip of Lake Michigan." Plaintiff's argument is even less persuasive because its own proposed interpretation of "mass region" was largely a recitation of the mass region's spatial relationship to other parts of the club. Simply, the specification is consistent with the claim and the plain meaning of the debated term.

As explained immediately below, the Court is inclined to accept Nike's assertion that at least one side of a "lip" must be generally parallel with the striking surface—although this issue may lack little practical consequence because it is difficult to see how anyone could market a golf club whose lip was not at least generally parallel to the rest of the striking surface, as it would not provide a good potential for hitting a true shot. As also explained below, however, the Court will reserve judgment on this issue as it has been briefed in only passing fashion and can be addressed, as appropriate, as the case progresses.

First, with respect to the issue of the Court's inclination to credit Nike's "generally parallel" contention, the specification makes clear that the reason for a "lip" is to increase the sweet spot on the club so as to make it easier to hit a successful shot. Unless the lip is at least generally parallel to the remainder of the sweet spot, it is difficult to see how a "lip" becomes anything other than an impediment to hitting a true shot. *See, e.g., Laitram Corp. v. Morehouse Indust., Inc.*, 143 F.3d 1456, 1463 (Fed. Cir. 1998) (holding that a "driving surface" is limited to a flat surface; this interpretations was supported by the specification's discussion of the invention's benefits, the benefits requiring a flat surface); *see also Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000) (commending district court's initial

43

claim interpretation, which was "consonant with the purpose of the invention").

The Court will not definitively rule on the "generally parallel" issue, however, because the parties have not thoroughly briefed the issue. In particular, the parties have not briefed the question of the propriety *vel non* of interpreting a claim term so that it is consistent with (and perhaps even not antithetical to) the purpose of the invention as stated in the specification. Accordingly, the Court will reserve final judgment at this time.

### iii.    Prosecution History

As to the issue of whether the "lip" is an extension "to" the striking surface, neither party points to anything persuasive in the prosecution history that would lead the Court to disregard the interpretive guidance identified above. Plaintiff notes in passing in a footnote that one snippet in the '446 claim language—which states that the lip "extend[s] between the striking surface and the top side of the mass region"—was omitted from the '026 patent. (D.E. 26 at 8 n.7 (citing D.E. 20, Ex. C, Col. 6:56-58; *compare id.*, Ex. A, Col. 6:56-58). The Court does not regard this difference as material. The two patents contain extensive, duplicative claim language that direct the claim interpretations set forth herein. *See* D.E. 20, Ex. A, Col. 6:55-56 (stating that the "striking surface [of the club] extends above a top side of said mass region to form a lip . . . ."); *accord id.*, Ex. C, Col. 6:57-58; *see also id.*, Ex. A, Col. 7:3-6 ("the height of said lip . . . is the vertical distance between the top edge of said striking surface and the top side of said mass region, [and] is between about 1/8 inch and about 1/2 inch."); *accord id.*, Ex. C, Col. 7:11-13. There is also substantial evidence in the specification that provides guidance and a lexicography concerning the proper interpretation of the disputed terms. *See, e.g.*, D.E. 20, Ex. A, Col. 3:48-

44

54 (stating that the "lip between the top edge of the striking surface and the mass region is formed by extending the striking surface above the top side of the mass region"); *accord id.*, Ex. C, Col. 3:52-58; *see also* Ex. A, Col. 4:66-5:4 (stating that the "mass region is provided behind the club head striking surface. The mass region is connected to the striking surface at a lip . . ."); *accord id.*, Ex. C, Col. 5:1-6.

As for the "generally parallel" issue, the parties also do not identify anything in the prosecution history that is particularly material. The Court has conducted an independent review and has not identified anything either. Because the Court is not resolving this sub-issue at this time, however, the parties will have an opportunity to discuss the prosecution history and any alleged relevance in this regard at an appropriate juncture.

Based on the evidence and arguments presented, the Court recognizes the following construction for the term "lip" in Plaintiff's patent: "An extension to the striking surface adjacent to the striking surface, reaching or spanning between the striking surface and mass region, with a vertical distance between the top edge of the striking surface and the top side of the mass region of about 1/8 inch and about 1/2 inch."

B.    Infringement

Nike's summary judgment papers, and Wedgewood's responsive papers, are all fundamentally framed within the context of Nike's proposed claim construction. As explained above, the Court has not adopted wholesale the proposed construction of Nike (or Wedgewood either, to be fair) but rather has drawn from each of the parties' respective proposals. At times, the Court also has charted a middle course suggested by the competing positions.

45

Because the Court's construction of the relevant terms no longer comports precisely with the framing of the briefs (which, again, are largely predicated on an analysis of the factual record in light of Nike's proposed construction), the Court does not believe it prudent to assess whether summary judgment is warranted post-claim construction without meaningful adversarial presentations in that regard. Accordingly, the Court denies Nike's summary judgment motion without prejudice.

The parties have previously informed the Court that the adjudication of Nike's motion might streamline discovery going forward. Wedgewood also has indicated that it might file a summary judgment motion once the patent has been construed. Now that the Court has construed the patent, the parties can decide whether they believe it most sensible to complete further discovery, or to continue motion practice (either at the behest of Nike or Wedgewood, as Nike's instant motion for summary judgment is denied without prejudice) in light of the claim construction set forth herein.

## VII.  CONCLUSION

For the reasons set forth above, Nike's motion for summary judgment of non-infringement is denied without prejudice.  Nike's motion to strike portions of the declaration of Dr. Darin Aldrich is also denied without prejudice.

So Ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Dated:  *2 - 9 - 05*



FIG. 1

FIG. 2

## FIG. 5



4

**FIG. 6**



**FIG. 7**

